## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
## INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| NICOLE WILSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:19-cv-02511-TWP-DML |
| | ) | |
| REGAL BELOIT AMERICA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendant Regal Beloit America, Inc. ("Regal") (Filing No. 49). Plaintiff Nicole Wilson ("Wilson") initiated this action after her seventeen months of employment with Regal ended. She filed an Amended Complaint alleging various employment claims against Regal pursuant to the Americans with Disabilities Act ("ADA"), Title VII of the Civil Rights Act ("Title VII"), and the Family and Medical Leave Act ("FMLA") as well as state-law claims of false imprisonment and intentional infliction of emotional distress.  (Filing No. 39). For the following reasons, the Court **grants in part and denies in part** Regal's Motion.

## I.    BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Wilson as the non-moving party.  *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Regal, a Wisconsin corporation headquartered in Beloit, Wisconsin, has an office located in Plainfield, Indiana (Filing No. 39 at 3). Regal is a manufacturer of electric motors, electrical motion controls, and power generation and transmission components (Filing No. 50-1 at 195).

Wilson began working for Regal in August 2017 as a transportation supervisor at the Plainfield location. *Id.* at 61–62, 184. Mike Brock ("Brock") and Stella Shultz ("Shultz") interviewed her for the position. In her role as a transportation supervisor, Wilson oversaw a team of transportation planners. She reported to Brock, the domestic transportation manager, and Brock in turn reported to Doug Smith ("Smith"), the domestic and international transportation manager. *Id.* at 58, 62, 65–66. Throughout her employment with Regal until she resigned in January 2019, Wilson held the same position, received a small pay raise, never received any reduction in pay, never received disciplinary action, never incurred any change in terms of management responsibility with the people reporting to her, received only positive performance evaluations, and never received a bad performance evaluation. *Id.* at 10, 54–55, 62, 65, 76, 143–44.

On May 10, 2018, Wilson was having a casual discussion with her immediate supervisor, Brock, in the late afternoon. This casual conversation occurred in Brock's office. Their work colleague, Doug Pirtle ("Pirtle"), joined them in Brock's office and started chatting with them. The door to Brock's office was shut. Kari Ponder ("Ponder"), Regal's onsite human resources representative, walked by the office and looked in. Within a matter of minutes, Brock's supervisor, Smith, came into the office and slammed the door shut behind him. *Id.* at 85–86.

Smith was very red with veins popping out of his neck and fists clenched, and he appeared enraged. Wilson jokingly said to Smith, "'[D]ang, Hulk, calm down' because he looked like the Incredible Hulk." *Id.* at 86. Smith yelled at Wilson, Brock, and Pirtle, wanting to know what they were talking about. He then claimed to know what they were talking about and accused them of

perpetuating and escalating tension in the office and discussing his personal life. Wilson responded that his assumption was wrong, and Pirtle told Smith that he did not even know what they were talking about. Smith continued to yell at them and yelled in Pirtle's face. *Id.* at 86–87.

Smith yelled at Pirtle that he did not like how Pirtle handled a work situation, and Wilson said that it did not pertain to her or her employees and she was going to leave. She stood up to leave, but Smith was in front of the door with his arm pressed against it, and he said to Wilson, "[Y]ou're not going anywhere. You're going to sit here and hear this too. I'm sick of you too." (Filing No. 50-1 at 87.) Brock motioned for Wilson to sit down, and Brock told Smith he was out of line and needed to calm down. *Id.*

There was a window to Brock's office, and the employees who reported to Wilson heard the screaming and the door slamming, so they watched what transpired. Wilson was embarrassed, and she was afraid that the three men were going to physically attack each other, and she was stuck in the middle of them. Wilson again said that the conversation did not pertain to her and she wanted to leave, but Smith held the door handle and told her she was going to sit there and listen to him. Wilson buried her face in her lap and began crying because she was afraid. Smith and Pirtle began screaming again in each other's face, and Smith told Pirtle they could just take it outside. Wilson does not remember how the confrontation ended, but she looked up and saw Smith and Pirtle yelling at each other down the hallway, and Brock motioned at her to stay back. *Id.* at 87–89. Neither Smith nor anyone else at Regal ever physically touched or abused Wilson during this incident or at any other time, and no one threatened her with physical harm. *Id.* at 46, 85.

Wilson was shocked and scared by what had just happened, so she ran to the restroom to cry and wash her face. She returned to her office and sat there for a moment. Rather than reporting the incident to Ponder, the onsite human resources representative, Wilson instead sent an instant

message via Skype to Christina Shafer ("Shafer"), Ponder's offsite boss in human resources. Wilson was concerned that if she reported the incident to Ponder that Ponder would cover it up. *Id.* at 89, 99, 186.

Wilson began her report to Shafer at 2:56 p.m. on May 10, 2018, with "Hello :)" and then stated, "If you didn't hear by now, I'm just making a report to keep it on record I was just screamed at with Mike Brock and Doug Pirtle by Doug Smith for appears to be no reason whatsoever but false accusations." (Filing No. 50-1 at 186.) Wilson further explained to Shafer, "Unpleasant day to say the least. :|" and when Shafer asked if she had talked with Ponder, Wilson responded that she had not. *Id.* Wilson referred to Smith as a "negative dude," and closed her report to Shafer by stating, "Okay rant over. But it was very unnecessary." *Id.*

The following week, Shafer traveled to the Plainfield office to investigate the incident. Shafer talked with Wilson one-on-one. Shafer asked Wilson what she expected to come out of the incident and investigation, and Wilson responded that she thought Smith should be fired. Shafer also talked with Brock and Pirtle, and took notes during these conversations. *Id.* at 100–04. As a result of her investigation, Regal transferred Smith to another position and changed his role to a role in purchasing/global sourcing, moved his office, and placed him on a performance improvement plan based on his conduct. Wilson no longer reported up through Smith following the change in his role (Filing No. 50-1 at 53, 107–09; Filing No. 50-2 at 3–4).

Wilson had been working from home immediately after the incident occurred, and after Shafer completed her investigation, she called Wilson and told her it was safe to come back to work and that Smith should not be in the office. Shafer further explained to Wilson that Regal changed Smith's title and transferred him to global sourcing. Despite these assurances, Wilson still had concerns whether this change would require her to interact with Smith because her team

worked with global sourcing.  Wilson was not comfortable around Smith and asked for some space from him, so Regal moved Smith's office three doors down from her office near the women's restroom (Filing No. 50-1 at 52–53, 101, 107–08).

The actions Regal took with Smith were not satisfactory to Wilson because the only resolution to the situation that Wilson wanted and would have accepted was Smith being terminated.  Prior to May 10, 2018, Wilson had daily interactions with Smith, usually talking with him multiple times a day.  After Smith was transferred into his new role, Wilson no longer had any in-person conversations with him at work.  However, she did continue to see him around the office.  The next month, in June 2018, Wilson began looking for other employment so as to leave Regal, and she applied for ten to twelve jobs between June and December 2018.  She received two job offers but declined them.  *Id.* at 32–33, 54, 111–12, 148–49.

Around October 2018, while working at Regal, Wilson was diagnosed with complex post-traumatic stress disorder ("PTSD"), depression, and anxiety which cause her pain and affect her sleep.  Wilson attributes her PTSD, anxiety, and depression to her experiences at Regal.  She suffers from heart attack-like symptoms, has difficulty sleeping, and is prone to crying spells and migraines. She continues to experience symptoms of PTSD, anxiety, and depression.  While Wilson did not tell anyone at Regal during her employment that she had PTSD, she did tell Brock, Shafer, and Smith's boss that she had depression and anxiety.  Her anxiety and depression were triggered by seeing Smith, which led to her being unfocused, scared, and sad, and she would cry or hide.  Whenever Wilson saw Smith or Smith's girlfriend in public, she would become anxious, nervous, and scared (Filing No. 50-1 at 6–7, 10–11, 24–25, 49–50, 59).

Around November 5, 2018, Wilson sought emergency medical treatment at the hospital for chest pain, dizziness, and numbness. She appeared to be having stress and anxiety symptoms, and

she told Brock and Brock's manager that she needed to work from home for a period, which Regal permitted. *Id.* at 55–56, 182–83. Wilson received information about FMLA leave in connection with her employment but never turned in any FMLA leave request, documentation, or certification during her employment to pursue an FMLA leave of absence. Wilson was never disciplined for taking time off work, for using paid time off ("PTO"), for missing work, or for attendance issues during her employment. *Id.* at 74–76.

Wilson asked Brock for time off during her lunch breaks to go to therapy.  Brock would yell at Wilson and make her feel inadequate for taking time off and would refer to her mental health diagnoses as her "crazy head shit."  He would tell her that she could not attend certain work meetings because she had to go deal with her "crazy head shit."  At one point, Wilson contacted Shafer to ask about the FMLA process.  Shafer told Wilson there was a form she could fill out and then Shafer would involve Brock in the process.  Once Wilson learned Brock would be involved, she did not want to continue because of Brock's prior comments.  Wilson instead used her PTO days to go to therapy or deal with her symptoms because she was too afraid to ask for FMLA leave. *Id.* at 51–52, 75.

Wilson was precluded from participating in a training called "Green Belt Training," which teaches process improvement for manufacturing and transportation.  This training was held only once a year.  One of Wilson's annual performance goals was to attend this training and develop her skills in the area of process improvement.  While Brock told Wilson she was not permitted to attend Green Belt Training because she was dealing with her "head shit," Brock's boss explained to her that she could not attend the training because they were not sure if she was leaving for the National Guard; Wilson was tentatively scheduled to attend National Guard training during that same time period (Filing No. 50-1 at 140–42, 178).

Wilson traveled to Florence, Kentucky, every quarter because she and her team supported a facility there. Regal recently had purchased the Florence facility and was in the process of transitioning the facility into Regal's umbrella. Part of Wilson's responsibilities included taking her knowledge and implementing a rollout for this new facility as well as grow her team by bringing in staff for the Florence facility. She was actively involved in this project until November 2018 when Brock told Wilson she could not travel to the facility. Brock had scheduled a meeting in Florence and invited members of Wilson's staff but did not invite Wilson. When she asked why she was not invited, Brock told her it was because she was stressed out with her "crazy head shit," and she should stay back and work from home. He also explained to her that she always was taking care of parenting responsibilities with her kids, so he took the travel duties off her plate without first discussing it with her. *Id.* at 144–45, 149–50, 177.

Brock also told Wilson that she could not travel because she is a mother, she cannot leave her kids, and she was always gone taking care of her "kid shit." *Id.* at 146. Brock yelled at Wilson when she had to leave work to attend her children's doctor appointments or sporting events. He told Wilson that he would never again hire another female that was potentially a mother because he did not want to deal with someone leaving to take care of their children. *Id.* at 154–55.

In addition to comments about being a mother, Brock would make sexually inappropriate comments to and about Wilson. Brock would make comments about how good Wilson's and other female employees' breasts and cleavage looked when they wore V-neck shirts. When Wilson would wear a skirt, Brock would tell Wilson he hoped it was a windy day. Brock also told Wilson that he "would do really nasty shit . . . for some titties." *Id.* at 157–59.

In January 2019, a new employer offered Wilson a job, which she accepted. She voluntarily resigned from her employment with Regal by submitting her written notice on January

7, 2019, approximately seventeen months after starting with Regal. Wilson listed her last day of work as January 18, 2019, but a few days before then, Regal "cut [her] free early," without an explanation. Wilson has been able to work since leaving Regal and has had two jobs since leaving, including her current employment that she considers to be her dream job. *Id.* at 36–38, 76, 82–83, 185.

Soon after leaving Regal, Wilson filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC") on February 8, 2019, which she signed on January 14, 2019. She alleged harassment, retaliation, and discrimination based on sex and disability. While she was still at Regal, Wilson did not tell anyone at Regal that she intended to file the EEOC charge. *Id.* at 138–39, 192–96. On June 21, 2019, Wilson filed her lawsuit against Regal in this Court (Filing No. 1). Following a Motion to Dismiss and an Amended Complaint, Regal filed the instant Motion for Summary Judgment.

## II.        SUMMARY JUDGMENT STANDARD

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a

summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

The Court views the designated evidence in the light most favorable to Wilson as the non-moving party and draws all reasonable inferences in her favor. *Bright v. CCA*, 2013 U.S. Dist. LEXIS 162264, at *8 (S.D. Ind. Nov. 14, 2013). "However, employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes." *Id.* at *8–9 (citation and quotation marks omitted).

### III.     DISCUSSION

Wilson alleges the following claims in her Amended Complaint: Count I - violation of the ADA, Count II - retaliation under the ADA, Count III - violation of FMLA, Count IV - violation

of Title VII, Count V - retaliation under Title VII, Count VI - false imprisonment, and Count VII - intentional infliction of emotional distress (Filing No. 39). Regal seeks summary judgment on each of these claims. The Court will address each claim in turn after first addressing threshold matters raised by Regal.

**A.** **Threshold Matters**

Regal raises various threshold issues that the Court must address before it can resolve the separate claims on the merits.

**1.** **An Adverse Employment Action**

First, Regal argues that Wilson's discrimination and retaliation claims fail because she did not suffer a legally actionable adverse employment action. Throughout her employment, Wilson held the same position, never received disciplinary action, never received any reduction in pay, never incurred any change in terms of management responsibility with the people reporting to her, and never received a bad performance evaluation, only receiving positive evaluations until she resigned in January 2019. Furthermore, Regal asserts, Wilson cannot claim she was constructively discharged as an adverse employment action because her working conditions were not so intolerable that they would compel a reasonable person to resign.

Wilson responds that Regal took away leadership and growth opportunities when Brock told her she could no longer travel because of her motherly duties, and she points out that "[a] discriminatory denial of job-related training can constitute an adverse employment action under Title VII." *Durkin v. City of Chi.*, 341 F.3d 606, 611 (7th Cir. 2003). She further notes that the ADA prohibits discrimination "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Brock denied her job-related training

10

opportunities because of her mental health-related illnesses and disabilities. The Seventh Circuit has stated that, because the ADA specifically prohibits discrimination in regard to job training, where a plaintiff has direct evidence of discriminatory intent, she need not show that the denial of the training was materially adverse. *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 576 (7th Cir. 2001). Wilson additionally argues that the issue of constructive discharge is a factual dispute not well-suited for summary judgment.

The parties' arguments about adverse employment actions relate to the claims individually. Therefore, the Court will analyze and make determinations on this issue in the context of each of the claims, rather than as a threshold matter.

### 2.   Exhausting Administrative Remedies for the End of Wilson's Employment

Regal next argues that, to the extent Wilson bases her Title VII or ADA discrimination or retaliation claims on her resignation or the ending of her employment, those claims fail because Wilson failed to pursue and exhaust required administrative remedies. Wilson failed to challenge the ending of her employment in her EEOC charge of discrimination. Regal points out that the general rule for purposes of Wilson's ADA and Title VII claims is that "allegations that are not included in an EEOC charge cannot be contained in a subsequent complaint filed in the district court." *Kirk v. Fed. Prop. Mgmt. Corp.*, 22 F.3d 135, 139 (7th Cir. 1994). Wilson failed to raise the issue of "discharge"—whether voluntary, involuntary, constructive, or otherwise—in her EEOC charge and, therefore, failed to exhaust her required administrative remedy as to that issue. Thus, Regal argues, the Title VII and ADA claims must be dismissed to the extent they are based on the ending of Wilson's employment.

In response, Wilson argues that the standard for exhausting administrative remedies is a liberal standard to effectuate the remedial purposes of Title VII. *See Rush v. McDonald's Corp.*,

966 F.2d 1104, 1111 (7th Cir. 1992). Wilson argues that her Title VII and ADA discrimination and retaliation claims involve the same facts and the same individuals, thereby satisfying the requirement to exhaust administrative remedies. She asserts the ways in which she was discriminated against on the basis of sex and disability involve the same set of facts and the same individuals that caused her constructive discharge, and the same set of facts and individuals were responsible for retaliating against her. Therefore, Wilson argues, her Title VII and ADA claims should not be dismissed for failure to exhaust administrative remedies.

The Court first notes that the Seventh Circuit has held,

> A plaintiff may not bring claims in a lawsuit that were not included in the EEOC charge. This requirement serves to enhance the administrative enforcement process by ensuring that the EEOC can conduct a full investigation while also providing the employer with advance notice of the claim and an opportunity to resolve the dispute. As such, it is a procedural requirement that we take seriously. A claim falls within the scope of the EEOC complaint if it is like or reasonably related to the charges in the EEOC complaint and if it reasonably could have developed from the EEOC's investigation of the charges before it.

*Cable v. Ivy Tech State Coll.*, 200 F.3d 467, 476–77 (7th Cir. 1999) (internal citations and quotation marks omitted). "To be reasonably like or related, the charge in the lawsuit must describe the same conduct and implicate the same individuals as the charge in the EEOC complaint." *Id.* at 477.

Claims such as a failure to accommodate and a failure to promote are separate and distinct claims from a claim of constructive discharge. A hostile work environment claim and a constructive discharge claim have some similarities in that they typically involve a series of many acts creating one single condition or environment.  However, a hostile work environment claim and a constructive discharge claim are separate and distinct claims—a constructive discharge claim pertains to the ending of the employment relationship. Wilson's EEOC charge did not complain about her employment ending with Regal.  In fact, in her EEOC charge, which was prepared with the assistance of counsel (*see* Filing No. 50-1 at 138), Wilson stated that "Nicole Wilson is

employed by Regal . . . ." *Id.* at 194. She repeated again in her EEOC charge, "Nicole Wilson

("Nicole") is an employee of Regal . . . . Nicole works at Regal's Plainfield, IN location . . . ." *Id.*

at 195.

Based on her EEOC charge, Wilson still was an employee of Regal, so the facts are not the

same or reasonably similar in the EEOC charge and the Amended Complaint—Wilson is an

employee of Regal compared to Wilson is no longer an employee of Regal and she was

constructively discharged. Wilson's EEOC charge alleged harassment, retaliation, and

discrimination based on sex and disability; it did not allege termination or constructive discharge.

Because the EEOC charge alleged—in three places—that Wilson still was employed by Regal, a

constructive discharge or termination claim could not have reasonably developed from the EEOC's

investigation of the charges before it.

Under these facts and circumstances, Court concludes that Wilson failed to exhaust her

administrative remedies as to any constructive discharge or termination, so her Title VII and ADA

claims must be dismissed to the extent they are based on constructive discharge or termination.

### 3.     300-day Limitation Period for Filing with the EEOC

As another threshold matter, Regal argues that any charge of unlawful employment

practices must be filed with the EEOC within 300 days of its occurrence if the complainant first

initiated proceedings with a state agency possessing authority to grant or seek relief from such

practice. *See* 42 U.S.C. § 2000e-5(e)(1). Thus, Regal argues, in pursuing her Title VII and ADA

claims, Wilson may not seek recovery for anything that occurred more than 300 days prior to

February 8, 2019, when she filed her EEOC charge—in other words, anything occurring prior to

April 14, 2018.

Wilson responds that the general rule requires charges of unlawful employment practices to be filed within 300 days of the occurrence of the unlawful practice; however, hostile environment claims consist of more than just one isolated act.  Hostile environment claims, by their very nature, involve repeated conduct. For hostile work environment claims, courts review all the circumstances because a hostile work environment is composed of a series of separate acts that collectively constitute one unlawful employment practice. Wilson asserts that it does not matter that some of the component acts of the hostile environment claim fall outside the statutory time period; as long as an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered for purposes of determining liability. *See AMTRAK v. Morgan*, 536 U.S. 101, 115–17 (2002).

Wilson's argument is well-taken, and the Court will consider the separate acts that collectively constitute the series of acts making up the one unlawful employment practice of a hostile work environment.

### 4.    Broadening the Scope of the Claims

In its reply brief, Regal raises another threshold matter: Regal argues that Wilson has attempted to recharacterize, expand, and add to her pleaded claims through her response brief. Regal argues that Wilson's Amended Complaint and Statement of Claims base Count II (ADA retaliation) solely on the allegation that Regal terminated her employment. As to Count I (ADA discrimination), Regal argues the Amended Complaint bases the claim on a failure to accommodate and the alleged termination.  But in opposing summary judgment, Wilson appears to attempt to add new allegations for these ADA claims such as a hostile work environment under the ADA. This, Regal argues, is not permissible.

Regarding Count III of the Amended Complaint (FMLA violation), Regal asserts that Wilson based her claim on the allegation that Regal terminated her employment as retaliation for asserting or exercising her FMLA rights.  However, she appears to try to add an FMLA interference claim in her summary judgment response brief.  Regal also argues that Wilson limited her Title VII discrimination claim (Count IV) to a claim based on a hostile work environment.  Regal argues Wilson cannot amend or expand her claims in her response brief.

Regal is correct that "a plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002) (internal citation and quotation marks omitted).  Furthermore, a party's statement of claims is not a pleading, so such a filing does not provide for expanding or amending a complaint. *See Hankins v. Cox*, 2015 U.S. Dist. LEXIS 49904, at *4 (S.D. Ind. Apr. 15, 2015); Fed. R. Civ. P. 7(a).  After a careful review of the Amended Complaint as a whole as well as the individual claims, the Court reaches the following conclusions regarding the scope of the claims:

Count I – Wilson's ADA violation claim is limited to the theories of termination of her employment, discriminatory job training, and a failure to accommodate her mental health impairments. This claim does not extend to a theory of a hostile work environment.

Count II – Wilson's ADA retaliation claim is limited to the theory of termination of her employment.

Count III – Wilson's FMLA violation claim covers both interference and retaliation, not just retaliation as argued by Regal.

Count IV – Wilson's Title VII violation claim is limited to the theory of a hostile work environment based on sex.

Having resolved the threshold issues raised by Regal, the Court will now turn to each of the claims brought in the Amended Complaint.

**B.**   **Violation of the ADA**

In her Amended Complaint, Wilson alleges that Regal violated the ADA by failing to accommodate her mental health impairments and engaging in discriminatory job training.  She also alleges that Regal violated the ADA by terminating her employment.  However, as discussed above, Wilson failed to exhaust her administrative remedies as to any constructive discharge or termination, so the Court's analysis is limited to Wilson's claims of a failure to accommodate and discriminatory job training.

To support a claim under the ADA, a plaintiff must show: "1) that she is disabled; 2) that she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and 3) that the employer took an adverse job action against her because of her disability or failed to make a reasonable accommodation." *Stevens v. Ill. DOT*, 210 F.3d 732, 736 (7th Cir. 2000).

Regal argues it is not clear that Wilson can establish she is disabled. Wilson asserts that she has PTSD, depression, and anxiety, but Regal argues she is not limited in any major life activity. Wilson is able to work and has had two jobs since leaving Regal. Wilson never informed anyone at Regal that she suffered from PTSD, and, thus, Regal could not have accommodated her PTSD. Additionally, Regal argues it did not deny a reasonable accommodation to Wilson. When Wilson requested to work from home, Regal allowed her to do so. Wilson was never disciplined for taking time off work, using PTO, missing work, or attendance.  The accommodation Wilson sought was for Smith's employment to be terminated, but Regal was not required to provide the precise accommodation requested, *see Gile v. United Airlines*, 95 F.3d 492, 499 (7th Cir. 1996);

rather, Regal only had to provide a reasonable accommodation, and Regal asserts that it did so by transferring Smith to a new role and location and providing Wilson with a new supervisor. As a result, Wilson no longer had any in-person communications with Smith after these changes.

Regal also argues Wilson did not suffer an adverse employment action because of her disability. Regal asserts that Wilson claims she was denied a training opportunity because of her "crazy head shit," but she also acknowledged in her deposition that National Guard training conflicted with the work training opportunity, so, Regal asserts, there was no disability discrimination as to any training opportunities.

In response, Wilson asserts that the term disability means "a physical or mental impairment that substantially limits one or more major life activities of such individual" or "being regarded as having such an impairment." 42 U.S.C. § 12102(1)(A), (C). "Major life activities" include the basic functions of life such as "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, . . . breathing, learning, reading, concentrating, . . . and working." 29 C.F.R. § 1630.2(i). Wilson asserts that she has designated evidence that her mental impairments (PTSD, anxiety, and depression) negatively impacted her ability to work at Regal, caused her to lose focus at work, affected her sleep, made her physically ill, and caused her to not leave her bed on occasion. Alternatively, Regal regarded Wilson as having an impairment; Wilson notes that she designated evidence that Brock, her immediate supervisor, excluded her from meetings and training, telling her that she had to deal with the "crazy head shit."

Viewing the evidence in the light most favorable to Wilson as the non-moving party, the Court determines at this stage of the litigation that Wilson has presented evidence to support the element that she is disabled or regarded as disabled to support her ADA claim. This is based on

the evidence of mental health impairments; their effect on Wilson's ability to sleep and concentrate; and comments by a supervisor regarding Wilson's mental health.

Concerning an adverse employment action, Wilson responds that the ADA prohibits discrimination in "regard to job application procedures, the hiring, advancement, or discharge or employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The Seventh Circuit held that because the ADA specifically prohibits discrimination in regard to job training, where a plaintiff has direct evidence of discriminatory intent, she need not show that the denial of the training was materially adverse. *Hoffman*, 256 F.3d at 576. Wilson's supervisor specifically told her that she could not attend Green Belt Training because of her mental health impairments. Thus, Wilson argues, she suffered an adverse employment action because of her disability.

Regarding a failure to accommodate, Wilson argues that Regal knew she suffered anxiety and depression, which was triggered by Smith. Despite knowing this, Regal did not take reasonable actions to accommodate Wilson's anxiety and depression. While Smith was given a new role and a new office, and Wilson no longer reported to Smith, Smith's new office was only three doors down from Wilson's office and near the women's restroom, which caused Wilson to avoid using the restroom at work for fear of running into Smith. Smith's new role also was in the same department as Wilson, so he still interacted with her team. Wilson argues that these facts present a dispute about whether Regal provided a reasonable accommodation.

Because the Court is reviewing a summary judgment motion, the Court views the designated evidence in the light most favorable to Wilson as the non-moving party and draws all reasonable inferences in her favor, but it does not weigh the evidence. There is evidence in the record to support the claim that Regal denied Wilson a job training opportunity because of her

disability. Brock knew Wilson had anxiety and depression, and he told her that she could not participate in the Green Belt Training because of her "head shit."  While Brock's boss told Wilson she could not attend the Green Belt Training because of a conflict with National Guard training, the evidence of Brock's comments to Wilson support her ADA discrimination claim at this stage of the litigation.  Furthermore, there is evidence that could support Wilson's claim that Regal did not reasonably accommodate her disability.  While Regal permitted Wilson to work from home and use PTO at times, it is factually debatable whether it was a reasonable accommodation to move Smith three office doors down from Wilson and near the women's restroom when Smith was the source of Wilson's anxiety and depression. Therefore, Wilson's claim for violation of the ADA based upon a failure to accommodate and discriminatory job training may proceed beyond the summary judgment stage.

**C.**     **Retaliation under the ADA**

Based on the Court's determinations above—Wilson's ADA retaliation claim is based solely on the alleged termination of her employment, and Wilson failed to exhaust her administrative remedies as to any constructive discharge or termination—Regal is entitled to summary judgment on Wilson's ADA retaliation claim.

**D.**     **Violation of the FMLA**

Wilson brings a claim for violation of the FMLA based on the allegations that Regal interfered with her use of FMLA leave as well as retaliated against her. The FMLA prohibits employers from retaliating against or interfering with an employee's use of or attempt to exercise her right to FMLA leave.  *See Goelzer v. Sheboygan Cty.*, 604 F.3d 987, 995 (7th Cir. 2010); *de la Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 686 (7th Cir. 2008).  An FMLA retaliation claim requires proof of discriminatory or retaliatory intent whereas an FMLA interference claim

requires proof that the employer denied an employee's benefits under the FMLA. *Goelzer*, 604 F.3d at 995; *see also Shaffer v. AMA*, 662 F.3d 439, 443 (7th Cir. 2011).

To support an FMLA interference claim, a plaintiff must show: "(1) she was eligible for the FMLA's protections, (2) her employer was covered by the FMLA, (3) she was entitled to leave under the FMLA, (4) she provided sufficient notice of her intent to take leave, and (5) her employer denied her FMLA benefits to which she was entitled." *Guzman v. Brown Cty.*, 884 F.3d 633, 638 (7th Cir. 2018).

"In order to prevail on a FMLA retaliation claim, a plaintiff must present evidence that she was subject to an adverse employment action that occurred because she requested or took FMLA leave." *Id.* at 640. The plaintiff must show that "(1) the employee engaged in statutorily protected activity; (2) the employer took adverse action against the employee; and (3) the protected activity caused the adverse action." *Freelain v. Vill. of Oak Park*, 888 F.3d 895, 901 (7th Cir. 2018).

Regal argues that Wilson's claim for FMLA interference and retaliation fail because Wilson never requested, certified the need for, or took FMLA leave during her employment with Regal. Wilson received information about FMLA leave in connection with her employment, but she never turned in any FMLA leave request, documentation, or certification of a need for FMLA leave during her employment to pursue an FMLA leave of absence. Wilson never was disciplined for taking time off work, for using PTO, for missing work, or for attendance during her employment with Regal. Regal argues there can be no possible FMLA interference under these circumstances, and there can be no FMLA retaliation because Wilson did not engage in any protected activity under the FMLA. Regal further argues Wilson did not suffer an adverse employment action, and there is no evidence to support a causal connection between the FMLA and anything negative that happened to Wilson during her employment.

Wilson responds that the requirement that she provide sufficient notice of her intent to take FMLA leave is not an onerous requirement. "When an employee seeks leave for the first time for a FMLA-qualifying reason, the employee need not expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.303(b). "The employee's notice obligation is satisfied so long as he provides information sufficient to show that he *likely* has an FMLA-qualifying condition." *Burnett v. LFW Inc.*, 472 F.3d 471, 479 (7th Cir. 2006) (emphasis in original). The notice element does not require a direct demand for FMLA leave.  When an employee has requested days off and the employer is aware of the need for treatment, such notice is sufficient to survive summary judgment.  *See Pagel v. Tin Inc.*, 695 F.3d 622, 628–29 (7th Cir. 2012).

Wilson explains that after the May 10, 2018 confrontation, Wilson asked Brock for permission to take time off during her lunch breaks to go to therapy, and Brock would make demeaning comments about Wilson's "crazy head shit." Wilson also requested information about FMLA leave from Shafer.  When Shafer told Wilson that Brock would be involved in the FMLA process, Wilson was too embarrassed to continue the process.  Brock's hostility caused Wilson to use PTO to go to therapy because she was afraid to ask for FMLA leave.  Wilson argues that her notice to Brock of her need to go to therapy and her FMLA inquiry to Shafer is sufficient notice to Regal of her "likely FMLA-qualifying condition." She asserts that whether her notice was sufficient is a factual question inappropriate for resolution by summary judgment.

Wilson also argues that there is evidence to support her FMLA retaliation claim. Brock excluded Wilson from work meetings while she was working from home and dealing with her "head stuff," and he precluded her from participating in Green Belt Training because she was dealing with her "head shit."

After a careful review of the case law and the designated evidence, the Court concludes that summary judgment is not appropriate on the FMLA claim. While there is not much evidence, the evidence is enough to move beyond summary judgment based upon the Seventh Circuit precedent in *Burnett* and *Pagel* as well as 29 C.F.R. § 825.303(b).

The Seventh Circuit explained in *Burnett*, "[W]e have said that an employee may be excused from giving notice where his medical condition (e.g., clinical depression) prevents him from communicating the nature of his illness and resulting need for medical leave," or "when circumstances provide the employer with sufficient notice of the need for medical leave." *Burnett*, 472 F.3d at 479. These circumstances that excuse an employee from giving explicit FMLA notice are known as the *Byrne* exceptions.

The evidence suggests, at least at the summary judgment stage, that Wilson can take advantage of a *Byrne* exception because she communicated that she had anxiety and depression, she communicated her need to attend ongoing therapy, and she requested information about FMLA benefits. When she learned Brock was involved in the FMLA process, she was too embarrassed and afraid to officially request FMLA leave. At the summary judgment stage, this is enough to "show that [her] illness somehow impeded [her] ability to communicate [her] health needs to [her] employer." *Id.* at 480.

The Seventh Circuit further explained that, "[o]nce an employee informs his employer of his probable need for medical leave, the FMLA imposes a duty on the employer to conduct further investigation and inquiry to determine whether the proposed leave in fact qualifies as FMLA leave." *Id.* The evidence does not indicate that Regal made any such inquiry. And as the Seventh Circuit stated, "The fifth prong of the test[—her employer denied her FMLA benefits to which she was entitled—]need not detain us long as it is beyond dispute that [Regal] failed to provide

[Wilson] with requested leave." *Id.* at 478. Thus, summary judgment is not appropriate on the FMLA interference claim.

Regal's argument in favor of summary judgment on the FMLA retaliation claim is likewise founded upon Wilson's lack of notice and lack of actually taking FMLA leave, so she did not engage in statutorily protected activity. Regal also argues that Wilson did not suffer an adverse employment action, and there is no evidence to support a causal connection between the FMLA and anything negative at work that happened to Wilson.

The Court does not weigh the evidence during summary judgment proceedings, and it views the evidence in favor of the non-moving party—Wilson. The evidence indicates that Wilson took time off, using PTO, to address her mental health impairments, and attempting to take FMLA leave is protected activity.  Brock's comments about Wilson having to work from home to deal with her "head stuff" and his demeaning responses to her requests for time off to go to therapy in connection with Brock's comment that she could not attend Green Belt Training because of dealing with her "head shit" is enough to support a causal connection between adverse employment action and Wilson's FMLA protected activity. Therefore, the FMLA retaliation claim may proceed beyond summary judgment.

**E.    Violation of Title VII**

Wilson's Title VII violation claim is based upon the theory of a hostile work environment based on her sex.

> To state a Title VII hostile work environment claim, a plaintiff must allege (1) she was subject to unwelcome harassment; (2) the harassment was based on her [sex]; (3) the harassment was severe or pervasive so as to alter the conditions of employment and create a hostile or abusive working environment; and (4) there is basis for employer liability.

*Huri v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 804 F.3d 826, 833–34 (7th Cir. 2015).

Regal argues that Wilson cannot support her Title VII hostile work environment claim, so summary judgment is appropriate. Regal argues that a hostile work environment cannot be established by Wilson's allegations of an individual calling her fat, individuals yelling at work, various comments she found to be inappropriate, Smith failing to hold a door for her so the door may have hit her, Smith once following her on the way home from work, Smith once approaching her at Meijer, Brock yelling at her and making comments about her "crazy head shit," and being excluded from meetings and a training opportunity. Regal asserts that none of this has to do with Wilson's gender, she was never subject to disciplinary action or negative performance reviews, and she did not report these allegations to anyone at Regal.

Regarding comments that possibly relate to gender, Regal points out that Wilson alleges Brock made comments about people having to leave work to care for children, comments about her or a co-worker wearing a V-neck shirt and talking about their breasts or cleavage, a comment that he hoped it was a windy day because he saw her in a skirt, and a comment that some people would not do certain things for a Klondike bar, but he would for breasts. Regal argues these periodic comments were not sufficiently severe or pervasive to alter Wilson's work environment and create employer liability. Additionally, Wilson admitted she did not report this through Regal's ethics hotline, to human resources, or through other appropriate channels so that Regal could address them. Regal argues this provides it with a complete defense to liability in this regard. *See Faragher v. City of Boca Raton*, 524 U.S. 775 (1998).

In response, Wilson notes that, in order to be actionable, the environment must be both objectively and subjectively offensive—one that a reasonable person would find hostile or abusive

and one that the victim in fact did perceive to be so.  *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21–22 (1993).  Wilson asserts that Brock regularly yelled at her when she had to leave work to take her children to doctor appointments or attend their sporting events.  Brock told Wilson on more than one occasion that he would never hire another female again that was potentially a mother because he did not want to deal with someone leaving to take care of their children. Brock made these comments on a weekly basis to Wilson. Wilson worked at Regal from August 2017 until January 2019, so Brock made approximately seventy-three comments to Wilson, degrading her for being a mother.

Brock made sexual comments about Wilson and other women in the office.  The frequency of the comments depended on Wilson's attire.  If she wore a V-neck shirt, Brock would tell her that her breasts looked good or that her cleavage stood out and told her she should wear the shirt again.   If Wilson wore a skirt, Brock would comment on her legs. Brock's comments about Wilson's body started soon after she started working at Regal and continued throughout her employment there.  He told Wilson when she was wearing a skirt that he hoped it was a windy day, causing Wilson to stop wearing skirts or dresses to work entirely.  Brock also told Wilson that "some people wouldn't do certain things for a Klondike bar, but [he] would do really nasty shit for some titties."  Brock's comments depended on what she was wearing but occurred every two weeks or so.  Wilson worked at Regal from August 2017 until January 2019, so Brock's sexual commentary on her body occurred at least thirty-six times.

Wilson argues that her failure to report the harassment does not doom her claim.  Wilson argues that Regal's reliance on *Faragher* is misplaced.  Where the harassment is carried out by a supervisor, then the employer can be held liable.  A supervisor is an individual who is empowered by the employer to take tangible employment actions against the victim/employee. *Vance v. Ball*

*State Univ.*, 570 U.S. 421, 424 (2013). When Wilson interviewed for the job with Regal, Brock was one of two individuals who interviewed her. Wilson reported directly to Brock on a daily basis. Brock was the individual who removed her responsibilities, such as the onboarding of the new facilities in Kentucky. Therefore, Wilson argues, Brock was a supervisor thereby giving rise to liability on the part of Regal.

Wilson argues that tangible employment action was taken against her by Brock. As part of her annual goals, Wilson was required to visit the facilities assigned to her on a quarterly basis. She had been assigned to assist with onboarding a new carrier that Regal had purchased in Kentucky. This project was a big step in advancing within Regal. However, Brock excluded Wilson from visiting this carrier and removed the onboarding project from her responsibilities. Wilson asserts that Brock told Wilson he was no longer permitting her to travel because she was a mother and was too busy taking care of her children.

Wilson testified that she felt there was no one to whom she could report the harassment by Brock because the Plainfield human resources representative (Ponder) had spread rumors about her.  And she was told to stop talking about the May 10, 2018 incident despite her complaints that nothing had changed in the office. Thus, Wilson argues, there is a factual question for a jury to decide whether it was reasonable for Wilson to not report the harassment.

After reviewing the designated evidence, the parties' arguments, and the relevant case law, the Court determines that Wilson's Title VII hostile work environment claim cannot survive summary judgment.  "Title VII imposes no general civility code.  It does not reach the ordinary tribulations of the workplace, for example, sporadic use of abusive language or generally boorish conduct."  *Vance*, 570 U.S. at 452 (internal citations and quotation marks omitted).  The evidence viewed in the light most favorable to Wilson supports the conclusion that Brock was Wilson's

supervisor.  And, arguably, the evidence supports a conclusion (or at least a factual dispute) that Brock's comments were pervasive or severe.  However, Wilson cannot support other aspects of her claim.

"When a supervisor engages in sexual harassment, the employer is liable for the harassment only if the harasser took a tangible employment action as part of his harassment. . . . A discriminatory denial of job-related training can constitute an adverse employment action under Title VII."  *Durkin*, 341 F.3d at 611. The only thing Wilson points to as a "tangible employment action" taken against her was the withholding of the training/opportunity to help with the onboarding of the new Kentucky facility.  However, the designated evidence is clear that this was withheld from Wilson because of her "crazy head shit," not because of her gender (Filing No. 50-1 at 144 –45).

Furthermore, "an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty under *Ellerth* to alert the employer to the allegedly hostile environment."  *Shaw v. AutoZone, Inc.*, 180 F.3d 806, 813 (7th Cir. 1999).  Wilson admits that she did not alert Regal to any hostile work environment based on sex, and her asserted reason for not doing so—her subjective feeling that there was no one to report to in human resources because of personal conflict or mistrust—does not alleviate her from her reporting requirement.

Because Wilson cannot satisfy each of the requirements for a Title VII hostile work environment claim, Regal's Motion for Summary Judgment is granted as to this claim.

F.    **Retaliation under Title VII**

In her Amended Complaint, Wilson asserts a claim against Regal for Title VII retaliation. To establish a claim for Title VII retaliation, a plaintiff must show that (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the two. *Burks v. Wis. DOT*, 464 F.3d 744, 758 (7th Cir. 2006). The plaintiff must show that she was retaliated against after engaging in activity protected under Title VII. *Mattson v. Caterpillar, Inc.*, 359 F.3d 885, 889 (7th Cir. 2004). Such protected activity consists of opposing or complaining about discrimination or harassment by the employer based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a).

Regal argues that Wilson complained to human resources about Smith's May 10, 2018 confrontation and a subsequent telephone call from Smith's girlfriend.  However, there was no reference to any protected characteristic, including sex. Wilson did not complain about discrimination or harassment based on sex. The May 10, 2018 confrontation was between Smith and Wilson along with two other males.  Thus, this incident was gender-neutral.  Regal asserts that Wilson admitted that she never reported Smith's or Brock's other comments or actions that could even arguably be related to sex, and she never told anyone at Regal that she intended to file her EEOC charge.  Thus, Regal argues, Wilson never engaged in activity protected by Title VII.  Regal additionally argues that Wilson never suffered an adverse employment action, and she cannot show any causal connection between activity protected under Title VII and anything that happened to her at Regal.

Wilson did not respond to Regal's argument that she failed to engage in any statutorily protected activity under Title VII, and Wilson did not present any arguments for her Title VII retaliation claim independent of her arguments for her Title VII hostile work environment claim.

The designated evidence is clear that Wilson did not oppose or complain to anyone at Regal about sexual harassment or sex discrimination. As such, she did not engage in any activity that was protected by Title VII, and Regal could not have taken any adverse employment actions against her because of statutorily protected activity. Therefore, Wilson's Title VII retaliation claim must be dismissed on summary judgment.

**G.      False Imprisonment and Intentional Infliction of Emotional Distress**

The last two claims in Wilson's Amended Complaint are for the state law claims of false imprisonment and intentional infliction of emotional distress.

Regal argues that both of these claims are intentional torts, which require proof of intent to commit the tort and cause the harm that Wilson alleged. Regal asserts that there is no evidence that anyone set out to commit these torts against Wilson. Regal argues Smith yelled at Wilson, Brock, and Pirtle during the May 10, 2018 encounter, and Smith got in a shouting match with Pirtle; there is no evidence the situation was intended to target Wilson specifically or intentionally cause her the alleged harm she now seeks to redress in tort. Regal contends that Wilson cannot support with evidence each of the elements of each of the claims.

Additionally, Regal argues,

> The Indiana Supreme court has decided the issue of whether the Worker's Compensation Act ("WCA") preempted intentional tort claims against employers by their employees. The Court held that because the WCA covers injuries that occurred "by accident," intentional torts are not within the WCA's coverage, and thus are not preempted by the WCA. *Baker v. Westinghouse Electric Corp.*, 637 N.E.2d 1271, 1274 (Ind. 1994). However, to prove that *the employer* intended the harm, the court held that a showing of mere negligence was insufficient, even if the negligence could be characterized as reckless or wanton. *Baker*, 637 N.E.2d at 1275. The Court also rejected a *respondeat superior* analysis holding that while an intentional tort committed by a supervisor, manager or foreman could subject *that individual* to tort liability, it would not necessarily expose the employer to liability. *Baker*, 637 N.E.2d at 1275.

([Filing No. 51 at 22](#) (emphasis in original).)

Regal continues,

> To impute tortious intent to Regal, Wilson must demonstrate either that "(1) the corporation is the tortfeasor's alter ego, or (2) the corporation has substituted its will for that of the individual who committed the tortious acts." *Perry v. Stitzer Buick GMC, Inc.*, 637 N.E.2d 1282, 1287 (Ind. 1994). To prevail under the alter ego theory, Wilson must show that both ownership and control of Regal are in the alleged tortfeasor's hands. *Id.* To succeed under the other theory, Wilson must show that the individual who committed the tort was acting pursuant to a policy or decision made through Regal's regular decision-making channels by those with authority to do so. *Id.* Wilson's alleged injury must be shown to be the intended product of the policy or decision at issue if she is to prevail. *Id.*

(Filing No. 51 at 22.)

Regal asserts that the tort claims arise out of the May 10, 2018 confrontation.  Smith entered Brock's office where Wilson, Brock, and Pirtle had been talking.  Smith began yelling at them and screaming in Pirtle's face, which escalated to the point where Smith discussed taking it outside. Wilson twice asked to leave, but Smith told her to stay to listen to what he had to say, and Smith stood in front of Pirtle and between Wilson and the door with his hand on the door handle.  Regal argues that, clearly, if such actions rise to the level of a tort, the purported tortfeasor within this situation was Smith.  Regal argues Wilson cannot show that Smith, a local supervisor working for a national corporation, had the necessary ownership or control of Regal to proceed under an alter ego theory.  Furthermore, she cannot show that Smith acted pursuant to Regal's policies or procedures as he was removed from his position and further subjected to a performance improvement plan for his actions on May 10, 2018, which were found to be contrary to Regal's polices.  Thus, Regal asserts, the undisputed facts demonstrate that there is no basis to impute any tortious intent to Regal, so Wilson's state law tort claims fail as a matter of law.

Wilson responds that whether employees acted as the alter ego of the employer or independently is a factual matter for jury resolution pointing to *West v. LTV Steel Co.*, 839 F. Supp. 559, 563 (N.D. Ind. 1993).  Wilson argues, drawing all reasonable inferences in her favor, a trier

of fact could determine that Brock's and Smith's actions toward her were beyond all bounds of decency, and thus, her intentional infliction of emotional distress claim should survive summary judgment.

She additionally argues that "a blanket rule holding all sexual attacks outside the scope of employment as a matter of law because they satisfy the perpetrators' personal desires would draw an unprincipled distinction between such assaults and other types of crimes which employees may commit in response to other personal motivations, such as anger or financial pressures." *Stropes by Taylor v. Heritage H. Childrens Ctr. of Shelbyville, Inc.*, 547 N.E.2d 244, 249 (Ind. 1989). Wilson argues the nature of the wrongful act should be a consideration in the assessment of whether and to what extent Brock's and Smith's acts fell within the scope of their employment such that Regal should be held accountable.

The designated evidence and the relevant case law (*Baker* and *Perry*) compel this Court to enter summary judgment in favor of Regal on the claims for false imprisonment and intentional infliction of emotional distress. There is no factual dispute that requires resolution by a jury as implied by Wilson. There is no evidence to support or even infer that Smith or Brock (local supervisors) had the requisite ownership or control of Regal (a national corporation) for Wilson to proceed under an alter ego theory. And the evidence does not support that Smith or Brock acted pursuant to Regal's policies or procedures when they acted improperly toward Wilson. In fact, Smith's role was changed, and he was subjected to a performance improvement plan. The evidence does not support any basis to impute tortious intent to Regal.

Furthermore, Wilson's argument seems to suggest a theory of liability based upon *respondeat superior*, but such theory for Regal's liability for intentional torts was specifically

rejected by the Indiana Supreme Court in *Baker*. Regal is entitled to summary judgment on Wilson's intentional tort claims.

## IV.    CONCLUSION

For the reasons discussed above, Defendant Regal Beloit America, Inc.'s Motion for Summary Judgment, (Filing No. 49), is **GRANTED in part and DENIED in part**. Regal is **granted** summary judgment on Wilson's ADA retaliation claim, Title VII hostile work environment claim, Title VII retaliation claim, false imprisonment claim, and intentional infliction of emotional distress claim. Summary judgment is **denied** as to Wilson's claims for violation of the ADA based upon a failure to accommodate and discriminatory job training, as well as her FMLA interference and retaliation claim. Wilson may proceed beyond the summary judgment stage on these claims.

Because some claims have survived summary judgment, a new final pre-trial conference and jury trial date will be scheduled by separate Order.

**SO ORDERED.**

Date:  2/22/2021

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Jonathan A. Becker
CHURCH CHURCH HITTLE & ANTRIM
jbecker@cchalaw.com

Kaitlyn Elizabeth Collyer
CHURCH CHURCH HITTLE & ANTRIM
kcollyer@cchalaw.com

Brent R. Borg
CHURCH CHURCH HITTLE & ANTRIM
bborg@cchalaw.com

Craig M. Borowski
LITTLER MENDELSON, P.C.
cborowski@littler.com